**2013-1251, -1252**

_____

# United States Court of Appeals
# for the Federal Circuit

_____

DATATERN, INC.,

*Plaintiff-Appellant,*

*v.*

BLAZENT, INC.,

*Defendant-Appellee,*

*and*

EPICOR SOFTWARE CORPORATION,

*Defendant-Appellee,*

*and*

INFORMATICA CORPORATION,

*Defendant-Appellee,*

*(Caption Continued Inside)*

_____

*Appeal from the United States Court for the District of Massachusetts in consolidated Nos. 11-CV-11970 and 11-CV-12220, Judge F. Dennis Saylor, IV.*

_____

**JOINT BRIEF FOR CERTAIN DEFENDANT-APPELLEES**

GREG A. MADERA
ADAM J. KESSEL
SIVANANDA K. REDDY
FISH & RICHARDSON P.C.
One Marina Park Drive
Boston, MA 02210-1878
Telephone: (617) 542-5070

BENJAMIN K. THOMPSON
FISH & RICHARDSON P.C.
1180 Peachtree Street, 21st FL
Atlanta, GA 30309
Telephone: 404-724-2844

*Attorneys for Defendant-Appellee MicroStrategy Inc.*

*(For Continuation of Appearances See Inside Cover)*

July 25, 2013

# *CAPTION CONTINUED*

*and*

CARL WARREN & CO., INC.,

*Defendant-Appellee,*

*and*

LANCET SOFTWARE DEVELOPMENT, INC.,

*Defendant-Appellee,*

*and*

MAGIC SOFTWARE ENTERTAINMENT, INC. and MAGIC SOFTWARE ENTERTAINMENT, LTD,

*Defendants-Appellees,*

*and*

TERADATA CORPORATION,

*Defendant-Appellee,*

*and*

PREMIER, INC.,

*Defendant-Appellee,*

*and*

MICROSTRATEGY INC.,

*Defendant-Appellee,*

*and*

AIRLINES REPORTING CORPORATION,

*Defendant-Appellee.*

---

STEPHEN R. BUCKINGHAM
LOWENSTIEN SANDLER LLP
65 Livingston Ave.
Roseland, NJ 07068
Phone: 973-597-2326
*Attorney for Epicor Software Corporation*

MATTHEW E. LENO
MCDERMOTT WILL &
EMERY LLP
28 State Street
Boston, MA 02109
Phone: 617-535-4000
*Attorney for Premier, Inc.*

J. DAVID HADDEN
DARREN E. DONNELLY
RYAN TYZ
PHILLIP J. HAACK
FENWICK & WEST LLP
801 California Street
Mountain View, CA 94041
Phone: 650-988-8500
*Attorneys for Informatica Corporation*

MICHAEL C. MCCARTHY
KEIKO L. SUGISAKA
MASLON EDELMAN BORMAN
& BRAND, LLP
3300 Wells Fargo Center
90 South Seventh St.
Minneapolis, MN 55402
Phone: 612-672-8200
*Attorneys for Lancet Software
Development, Inc.*

CRAIG R. SMITH
LANDO & ANASTASI LLP
One Main Street
Cambridge, MA 02142
Phone: 617-395-7000
*Attorney for Teradata Corporation*

-and-

DOMINIC MASSA
WILMER CUTLER PICKERING
HALE & DOR
60 State Street
Boston, MA 02109
Phone: 617-526-6386
*Attorney for Airlines Reporting
Corporation*

BRIAN P. VOKE
CAMPBELL CAMPBELL
EDWARDS & CONROY
One Constitution Center, 3rd  Fl
Boston, MA 02129
Phone: 617-241-3000
*Attorney for Carl Warren & Co., Inc.*

RICHARD G. FRENKEL
MELISSA A. KOPACZ
LATHAM & WATKINS LLP
140 Scott Dr.
Menlo Park, CA 94025
Phone: 650-328-4600
*Attorneys for Blazent, Inc.*

FORM 9.   Certificate of Interest

---

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

DATATERN, INC.          v. BLAZENT, INC.

No. 13-1251, -1252

## CERTIFICATE OF INTEREST

Counsel for the ~~(petitioner)~~ ~~(appellant)~~ ~~(respondent)~~ (appellee) ~~(amicus)~~ ~~(name of party)~~
MicroStrategy Incorporated    certifies the following (use "None" if applicable; use extra sheets if necessary):

1.      The full name of every party or amicus represented by me is:

MicroStrategy Incorporated

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

Not applicable.

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

None.

4.  ☑   The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Gregory A. Madera, Benjamin K. Thompson, Sivananda Reddy and Adam J. Kessel of Fish & Richardson, P.C.

07/25/2013                              /s/ Benjamin K. Thompson
Date                                  Signature of counsel

Benjamin K. Thompson
Printed name of counsel

Please Note: All questions must be answered
cc: _____

FORM 9.  Certificate of Interest

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

DATATERN, INC.               v.  BLAZENT, INC.

No. 2013-1251

# CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)

appellee                          certifies the following (use "None" if applicable; use extra sheets if necessary):

1.      The full name of every party or amicus represented by me is:

Blazent, Inc.

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

Blazent, Inc.

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

Appellee states that it has no parent corporation, and there is no publicly held company that owns 10% or more of its stock.

4.  ☑   The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Richard G. Frenkel and Melissa A. Kopacz, of Latham & Watkins LLP, Menlo Park, California

March 27, 2013                          /s/ Richard G. Frenkel
        Date                              Signature of counsel

                                        Richard G. Frenkel
                                        Printed name of counsel

Please Note: All questions must be answered
cc: All counsel of record

124

Form 9

FORM 9.  Certificate of Interest

---

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

DataTern, Inc. _____ v. Blazent, Inc. et al. _____

No. 13-1251

## CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)
Epicor Software Corporation certifies the following (use "None" if applicable; use extra sheets if necessary):

1.  The full name of every party or amicus represented by me is:

Epicor Software Corporation

_____

2.  The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

Not applicable.

_____

3.  All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

EGL Holdco, Inc.

_____

4.  ☑  The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Stephen R. Buckingham, Lowenstein Sandler LLP, Jeremy A. Younkin, Foley Hoag LLP

_____

| | |
|---|---|
| 3/19/13 | //s//Stephen R. Buckingham |
| Date | Signature of counsel |
| | Stephen R. Buckingham |
| | Printed name of counsel |

Please Note: All questions must be answered
cc: All counsel of Record _____

124

FORM 9.  Certificate of Interest

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

DATATERN, INC.                           v.  BLAZENT, INC., ET AL.

No. 13-1251, -1252

## CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)

Appellee Informatica Corporation certifies the following (use "None" if applicable; use extra sheets if necessary):

1.      The full name of every party or amicus represented by me is:

Informatica Corporation

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

Informatica Corporation

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

None

4.  ☑   The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

J. David Hadden, Darren E. Donnelly, Ryan A. Tyz, and Phillip J. Haack of Fenwick & West LLP; Heather B. Repicky Nutter of McClennen & Fish, LLP

July 22. 2013

Date

/s/ Phillip J. Haack

Signature of counsel

Phillip J. Haack

Printed name of counsel

Please Note: All questions must be answered
cc: _____

Form 9

FORM 9.  Certificate of Interest

---

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

DataTern, Inc.          v.  Carl Warren & Co., Inc.

No. 13-1251

## CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)
Appellee - Carl Warren & Co., Inc. certifies the following (use "None" if applicable; use extra sheets if necessary):

1.      The full name of every party or amicus represented by me is:

Appellee - Carl Warren & Co., Inc.

---

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

N/A

---

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

Carl Warren & Co., Inc. states that it has no parent company or any publicly held company that owns 10% or more of its stock.

---

4. ☑   The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Brandon Arber, Campbell Campbell Edwards & Conroy, One Constitution Ctr., Boston, MA 02129
Adam P. Siegman, Greene Radovsky LLP, Four Embarcadero Ctr., Ste. 4000, San Francisco, CA 94111

---

7/25/13
_____          _____
        Date                          Signature of counsel

                                  Brian P. Voke
                                  _____
                                     Printed name of counsel

Please Note: All questions must be answered
cc: _____

124

Form 9

FORM 9.  Certificate of Interest

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

DataTern, Inc. _____ v. Blazent, Inc., et al. _____

No. 13-1251

## CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)
Appellee Lancet Software Development, Inc. certifies the following (use "None" if applicable; use extra sheets if necessary):

1.      The full name of every party or amicus represented by me is:

Appellee Lancet Software Development, Inc.

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:
N/A

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

Appellee Lancet Software Development, Inc. states that it has no parent company or any publicly held company that owns 10% or more of its stock.

4. ☑   The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Derek B. Domian, Richard J. Rosensweig, Goulston & Storrs, P.C., Boston, MA; and
Keiko L. Sugisaka, Justin H. Perl, Maslon Edelman Borman & Brand, LLP, Minneapolis, MN

June 10, 2013 _____         /s/ Michael C. McCarthy _____
Date                                Signature of counsel

                                    Michael C. McCarthy _____
                                    Printed name of counsel

Please Note: All questions must be answered
cc: _____

124

Form 9

FORM 9.   Certificate of Interest

---

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

DATATERN, INC. _____ v. BLAZENT, INC. _____

No. 13-1251, -1252

## CERTIFICATE OF INTEREST

Counsel for the (~~petitioner~~) (~~appellant~~) (~~respondent~~) (appellee) (~~amicus~~) (~~name of party~~)
Teradata Corporation _____ certifies the following (use "None" if applicable; use extra sheets if necessary):

1.      The full name of every party or amicus represented by me is:

Teradata Corporation

_____

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

Not applicable.

_____

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

None.

_____

4.  ☑  The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Craig R. Smith of Lando & Anastasi, LLP

_____

07/03/13 _____                    /s/ Craig R. Smith _____
              Date                                      Signature of counsel

                                        Craig R. Smith _____
                                              Printed name of counsel

Please Note: All questions must be answered
cc: _____

Form 9

FORM 9.  Certificate of Interest

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

DataTern, Inc.                          v.  Blazent, Inc., et al.

No. 2013-1251

# CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)

Appellee, Premier, Inc.        certifies the following (use "None" if applicable; use extra sheets if necessary):

1.      The full name of every party or amicus represented by me is:

Premier, Inc.

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

Premier, Inc.

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

None

4.  ☑  The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

McDERMOTT WILL & EMERY LLP: Matthew E. Leno, Sarah C. Columbia, Hasan M. Rashid

March 26, 2013
Date

/s/ Matthew E. Leno
Signature of counsel

Matthew E. Leno
Printed name of counsel

Please Note: All questions must be answered
cc: All counsel of record

Form 9

FORM 9.   Certificate of Interest

---

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Datatern, Inc. _____ v. Blazent, Inc. et al. _____

No. 2013-1251

## CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)

appellee _____ certifies the following (use "None" if applicable; use extra sheets if necessary):

1.     The full name of every party or amicus represented by me is:

Airlines Reporting Corporation

_____

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

Airlines Reporting Corporation

_____

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

Air Canada, Alaksa Airlines, American Airlines, Delta Airlines, Hawaiian Airlines, Jet Blue Airways, Southwest Airlines, United Airlines, US Airways.

_____

4.  ☐   The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Dominic Massa of Wilmer, Cutler, Pickering, Hale and Dorr LLP Boston, MA

_____

3/29/13 _____                    //s// Dominic Massa _____
Date                                        Signature of counsel

                                            Dominic Massa _____
                                            Printed name of counsel

Please Note: All questions must be answered
cc: _____

124

# TABLE OF CONTENTS

Preliminary Statement ..................................................................................................... 1

Statement of Related Cases ............................................................................................ 1

Jurisdictional Statement .................................................................................................. 2

Statement of the Issue .................................................................................................... 3

Statement of the Case ..................................................................................................... 3

Statement of Facts .......................................................................................................... 5

    I.   The Parties ....................................................................................................... 5

        A.    MicroStrategy Inc. ................................................................................ 5

        B.    Non-MicroStrategy Defendants (Co-Defendant-Appellees) ....................... 6

        C.    DataTern, Inc. ...................................................................................... 9

    II.   The '502 Patent:  Code Generation for Interfacing Object Oriented ..............................
        Programs with Relational Databases ................................................................. 9

    III.   The Accused Products ..................................................................................... 14

    IV.   The Underlying Litigations ............................................................................ 16

Summary of Argument .................................................................................................. 18

Argument ...................................................................................................................... 19

    I.   Standard of Review ........................................................................................ 19

    II.   Claim Construction Must Be Performed in the Context of the Entire Patent ............... 19

    III.   The Patent Specification Confirms Claim 1 Requires Generation of ..............................
        Computer Code to Create a Class ................................................................... 20

    IV.   The Surrounding Claim Language Confirms Claim 1 Requires Code ............................
        Generation for a Class .................................................................................... 25

    V.   Claim 10 Confirms That Claim 1 Requires Code Generation ....................................... 29

    VI.   DataTern Cannot Show Infringement Under The New York Court's
        Claim Construction ........................................................................................ 32

Conclusion ................................................................................................................... 34

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

**<u>TABLE OF AUTHORITIES</u>**

**Page(s)**

*Acumed LLC v. Stryker Corp.*,
    483 F.3d 800 (Fed. Cir. 2007) ..........................................................30

*Cybor Corp. v. Fas Techs.*,
    138 F.3d 1448 (Fed. Cir. 1998) (*en banc*) ......................................19

*DataTern, Inc. v. Blazent Inc.*,
    Case No. 1:11-cv-11970-FDS (Appeal No. 13-1251) ..........................1

*DataTern, Inc. v. MicroStrategy, Inc.*,
    Case No. 1:11-cv-12220-FDS (Appeal No. 13-1252) ..........................1

*Hockerson-Halberstadt, Inc. v. Converse Inc.*,
    183 F.3d 1369 (Fed. Cir. 1999) .........................................................25

*Hormone Research Found., Inc. v. Genentech, Inc.*,
    904 F.2d 1558 (Fed. Cir. 1990) .........................................................31

*IGT v. Bally Gaming Intern., Inc.*,
    659 F.3d 1109 (Fed. Cir. 2011) .........................................................26

*Kraft Foods, Inc. v. Int'l Trading Co.*,
    203 F.3d 1362 (Fed. Cir. 2000) .........................................................32

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*,
    521 F.3d 1351 (Fed. Cir. 2008) .........................................................25

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (en banc) ..................................19, 20

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*,
    242 F.3d 1337 (Fed. Cir. 2001) .........................................................19

*Sinorgchem Co. v. ITC*,
    511 F.3d 1132 (Fed. Cir. 2007) .........................................................30

*Texas Digital Sys., Inc. v. Telegenix, Inc.*,
    308 F.3d 1193 (Fed. Cir. 2002) .........................................................20

**STATUTES**

28 U.S.C. §1295(a)(1)................................................................................2

## ABBREVIATIONS AND CONVENTIONS

"BB" means DataTern's Blue Brief in this Appeal.

"Microsoft Appeal" means *Microsoft Corp. v. DataTern, Inc.*, Appeal No. 13-1184 (Fed. Cir.).

"SAP Appeal" means *SAP AG and SAP America, Inc. v. DataTern, Inc.*, Appeal No. 13-1185 (Fed. Cir.).

"MicrosoftBB" means DataTern's Blue Brief in the Microsoft Appeal.

"MicrosoftA" means the joint appendix in the Microsoft Appeal.

"SAPBB" means DataTern's Blue Brief in the SAP Appeal.

"SAPA" means the joint appendix in the SAP Appeal.

**Preliminary Statement**

This litigation against MicroStrategy and its customers and business affiliates is DataTern's latest in a long series of lawsuits alleging infringement of U.S. Patent No. 6,101,502 (the "'502 patent"). DataTern previously sued customers of Microsoft and SAP in the Eastern District of Texas, prompting Microsoft and SAP to initiate declaratory judgment actions against DataTern in the Southern District of New York. This appeal stems from a judgment of the District of Massachusetts, which was based on a claim construction ruling in the New York court that halted many of DataTern's ongoing litigations.

**Statement of Related Cases**

No other appeal from this civil action was previously before this or any other appellate court. Additional related cases, however, are pending before this Court.

Appellant DataTern is pursuing an appeal from its New York court losses against Microsoft and SAP in Federal Circuit Appeal Nos. 13-1184 and 13-1185. Those cases also involve the '502 patent at issue in this action. In those cases, DataTern appeals, *inter alia*, judgments of noninfringement of the '502 patent.

This appeal concerns two consolidated court cases DataTern brought in the Massachusetts court: *DataTern, Inc. v. MicroStrategy, Inc.*, Case No. 1:11-cv-12220-FDS (Appeal No. 13-1252) and *DataTern, Inc. v. Blazent Inc.*, Case No.

1:11-cv-11970-FDS (Appeal No. 13-1251). These cases have been consolidated for purposes of this appeal.

## Jurisdictional Statement

In the underlying Massachusetts court litigation, both MicroStrategy and DataTern separately moved for summary judgment based on DataTern's concession of noninfringement under the New York court's claim construction order. A73, A1200. MicroStrategy's motion sought summary judgment of noninfringement on six grounds stemming from the claim construction order. A1204-6. DataTern's motion, on the other hand, sought summary judgment on only one stipulated ground. A73. On February 7, 2013, the Massachusetts court entered a final judgment granting summary judgment of noninfringement on the stipulated ground and also granting summary judgment of noninfringement in favor of each MicroStrategy customer named in the two consolidated court cases. A1. DataTern appealed the Massachusetts court's judgment. A226.

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. §1295(a)(1).

## **Statement of the Issue**

Whether the Massachusetts court's summary judgment of noninfringement should be affirmed because the New York court correctly construed the term "to create at least one interface object" to require, in part, "to generate code for at least one class and instantiate an object from that class," based on an intrinsic record demonstrating that at design-time computer code is generated for an interface object class and at runtime an interface object is instantiated from that class.

## **Statement of the Case**

In late 2011, DataTern initiated its litigation campaign against MicroStrategy by filing seventeen lawsuits against MicroStrategy's customers and affiliates on the '502 patent. A1207 ¶ 1. The originally-filed complaints made no mention of MicroStrategy. A few weeks later, DataTern filed a second wave of five additional lawsuits against additional MicroStrategy customers before filing suit directly against MicroStrategy. A1208 ¶¶ 3, 5. DataTern also amended the customer complaints to assert infringement both as a result of each Defendant's independent actions (allegedly unrelated to their use of MicroStrategy products) as well as through their alleged use of MicroStrategy's products. *Id.* ¶ 2. DataTern later withdrew its infringement allegations against all non-MicroStrategy products and conceded that its only target was MicroStrategy. *See* A290. ("The focus of

3

this case has been and remains the Microstrategy [sic] technology . . . . DataTern does not intend to pursue in this action claims of infringement against each non-MicroStrategy defendant for alleged infringement independent of each defendants' use of Microstrategy [sic] products.").

Separately, DataTern has been in litigation with Microsoft and SAP and their customers in related cases involving the '502 patent in the Southern District of New York and Eastern District of Texas.  A1211 ¶ 36.  DataTern sued dozens of Microsoft's and/or SAP's customers in the Eastern District of Texas on the '502 patent and U.S. Patent No. 5,937,402 (the "'402 patent").  To defend their products and customers, Microsoft and SAP each filed declaratory judgment actions against DataTern in the Southern District of New York requesting judgment that their respective software does not infringe and that the patent claims are invalid.  *Id.* The New York cases were consolidated for pretrial proceedings.  In August 2012, the New York court entered an order in the consolidated cases construing certain terms of the '402 and '502 patents.  A101 [Markman Opinion and Order in Microsoft v. DataTern and SAP v. DataTern].  DataTern conceded noninfringement under the claim constructions and filed a motion seeking the entry of a declaratory judgment of noninfringement.  A1211 ¶ 38.  The New York court entered judgment against DataTern, A134, and DataTern has appealed.  *See* co-pending Appeal Nos. 13-1184 and 13-1185.

4

In the instant case as well, DataTern conceded noninfringement of the '502 patent under the New York court's claim construction order.  A86 [DataTern's Offer of Judgment].  MicroStrategy and DataTern separately moved for summary judgment based on DataTern's concession.  A73, A1200.  The Massachusetts court entered judgment against DataTern, in particular, based on the New York court's construction of the term "to create an interface object."  A6 ¶¶ 2-3.  DataTern appeals the judgment.  A1134.

## Statement of Facts

### I.    THE PARTIES

#### A.    MicroStrategy Inc.

Founded in 1989, MicroStrategy is a leading global provider of enterprise software platforms for business intelligence, mobile intelligence, and network applications.  A1220.  Its business intelligence products and services include reporting, analysis, and monitoring software.  A1223.  MicroStrategy's products enable companies to make business decisions based on analysis of data across very large enterprises—e.g., by providing senior executives with graphical desktops that show the real-time health of their companies.  MicroStrategy has operations in 26 countries worldwide and over 3,200 employees.  Over 25% of its workforce and

nearly $100M annually are dedicated to research and development activities, resulting in innovative patented technologies that businesses around the world use.

### B.    Non-MicroStrategy Defendants (Co-Defendant-Appellees)

### (a)    Teradata Corporation

Teradata is a leading provider of analytic data platforms, applications, and services.  DataTern has alleged that several Teradata programs infringe claims of the '502 patent because they use or integrate the MicroStrategy Intelligence Server platform provided by MicroStrategy.

### (b)    Epicor Software Corporation

Epicor delivers business software solutions, including enterprise resource planning, point of sale, and supply chain management solutions, to midmarket manufacturing, distribution, retail and services organizations in more than 150 countries.  Epicor is headquartered in California.  DataTern has alleged that certain Epicor products that incorporate the MicroStrategy Intelligence Server platform infringe the '502 Patent.

### (c)    Blazent Incorporated

Blazent is a privately-held California corporation that provides cloud-based information technology data integrity solutions.  Blazent's customers use Blazent's products, such as the accused Blazent for Enterprise IT solution, to manage and

optimize their information technology data.  Blazent for Enterprise IT relies on certain products offered by Microstrategy.

### (d)    Airlines Reporting Corporation

Airlines Reporting Corporation is a technology solutions company which provides transaction settlement and data information services.  The specific services accused in this litigation are known as the ARC Document Retrieval System, and ARC COMPASS database storage facility.  These accused services are used by nearly 14,000 travel agencies and 190 airlines for their document retrieval and storage services.

### (e)    Premier, Incorporated

Premier is a healthcare improvement alliance providing its hospital, alternate site and physician members with supply chain, informatics and consulting services that help them to lower the cost and improve the quality of care delivered to patients.  DataTern has alleged that the incorporation of MicroStrategy's Business Intelligence Platform into Premier's Clinical Advisor and Operations Advisor software cause those products to infringe the asserted patent.

### (f)    Carl Warren & Company

Carl Warren is a third-party claims administrator and litigation management company for insurance companies and self-insureds.  Carl Warren uses

MicroStrategy's product in its claims adjusting and litigation management business operations.

### (g)    Lancet Software Development, Incorporated

Lancet is a privately-held Minnesota corporation that delivers business intelligence solutions to customers in the healthcare, financial services, and retail industries.  Lancet provides business intelligence strategy and tools, project management, data management, user interface design and data visualization, platform administration, and training to clients around the world.  Lancet's headquarters are located in Burnsville, Minnesota.

### (h)    Informatica Corporation

Informatica is a publicly-traded Delaware corporation with its corporate headquarters in California.  Informatica is a leading provider of enterprise data integration software.  DataTern's infringement allegations against Informatica in this case are based on a press release that another company, Siperian, contemplated an offering involving a particular combination of its and Microstrategy products.  The contemplated offering with Microstrategy products never materialized in the marketplace, however, and none of the accused product combination was ever sold.  Informatica later acquired Siperian and it, as well, did not sell (or offer to or use) the accused product combination.

### (i)     Magic Software Enterprises, Incorporated and Magic Software Enterprises, Ltd.

Magic provides customers and partners around the globe with smarter technology that provides a multi-channel user experience of enterprise logic and data. Magic's future-proof platforms provide a productive environment for streamlined development and deployment, and effective integration of core business applications, supporting scalable deployment on multiple channels, including on-premise, Web (HTML5), rich Internet, mobile, and SaaS. DataTern has alleged that certain Magic products which incorporate the MicroStrategy Intelligence Server platform infringe the '502 Patent.

### C.     DataTern, Inc.

DataTern is a wholly-owned subsidiary of the New York-based, publically-traded venture capital company, Amphion Innovations. A1068 ¶8. DataTern was formed on April 5, 2007 to enforce and monetize the Patents-in-Suit. *See* BB at 12.

## II.     THE '502 PATENT: CODE GENERATION FOR INTERFACING OBJECT ORIENTED PROGRAMS WITH RELATIONAL DATABASES

The '502 patent centers on the concept of generating computer code for mapping object oriented applications to relational databases. *See* A235 [the '502 patent], Abstract. The problem of having object-oriented applications communicate with relational databases was old by the time DataTern filed its

provisional applications in 1997 and utility application in 1998. So DataTern focused on the particular idea of automating the generation of code during software design for accessing data in relational databases. *Id.* The '502 patent touts the advantage that "neither programmers nor software applications need to have knowledge of the database structure, [the] database programming interface … [or other details] in order to obtain access to the relational database." *Id.*, 1:66-2:5.

While certain programming languages step through a computer program code line-by-line from top-to-bottom, object-oriented programming is a paradigm that looks to relationships between "objects" that are created from "classes" that serve as templates for the objects. SAPA1085 [Hosking Decl.] ¶ 15; SAPA1086 ¶ 19; SAPA1090 ¶¶ 25-26.[1] For example, a personnel management program might include an "employee" class, that defines various "attributes" of an employee (e.g., the employee's hire date), and that stamps out a particular employee object when a new employee is entered into a company's system (which is done at "run-time."). The process of making an object using one or more classes is known as "instantiation." SAPA1090 ¶¶ 25-26. Figure 3 of the '502 patent shows a slightly

---

[1] To avoid wasting effort by the Massachusetts court and this Court, the parties agreed to abide by the claims constructions in the New York case, while preserving the right to challenge those constructions on appeal. As a result, the relevant record for the claim construction issues in this appeal includes the lower court records from the Microsoft and SAP Appeals, and citations labeled MicrosoftA and SAPA here reference the respective appendices filed in those appeals.

more complicated "object model" for the employee example, where the

"CEmployee" class has only a single attribute, but is tied to other classes that

define additional attributes for an employee:



For example, the arrow pointing upward from the CEmployee class to the

CPerson class indicates that CEmployee inherits all the attributes of CPerson, and

adds the "hiredate" attribute. *See* SAPA1106-7 ¶¶ 62-63. Similarly, the

EmpSalary and EmpHourly classes inherit the attributes of the CEmployee class

and add "salary" and "wage" attributes respectively. *Id.* The great benefit of

object-oriented programming is its modularity—i.e., each of these classes can be

re-used to stamp out additional objects, and can be copied from one program to

another program that involves employees in an organization. *See* SAPA1090 ¶ 26.

The '502 patent and its two provisional applications describe automatically

generating software code based on a "mapping" between object-oriented

applications and a relational database, and using the code to "facilitate access to

the relational database by [the] object-oriented applications." *See* A235, Abstract. The generated code is in the form of "interface object" classes that allows a software developer to design object-oriented applications in the same way that a database schema reflects the organization of a relational database. *See id.*, 1:63-2:5. At runtime, the interface object classes instantiate into "interface objects" that perform both "read and write operations on the database." *Id.*, 1: 63-65.

Asserted claim 1 of the '502 patent, for example, is directed to a method for "interfacing an object oriented software application with a relational database." An object model is selected with classes that most closely reflect the structure and type of data in the database. *Id.*, claim 1; 2:40-44. Then, a map is generated to define "at least some relationships between schema in the database and the selected object model," *e.g.*, relationships between classes in the model and tables in the database. *Id.*, claim 1; 2: 41-48. Next, the map is employed to generate code for classes that provide the "interface objects" for bridging the gap between data in the database and other objects corresponding to classes in the application. *Id.*, claim 1; Abstract. During runtime, when the software application is executed, the "interface objects" are instantiated from the classes. *Id.*; s*ee also* SAPA1121-22 ¶¶ 89-90. A runtime engine calls the interface objects, which query the database to obtain data. *Id.*

The "interface objects" described above are particularly relevant in this appeal. During design-time, *i.e.*, when the object-oriented software application is being developed, classes are defined and written in computer source code. *See* SAPA1109-10 ¶ 68; SAPA1090-91 ¶ 27. As part of the software development process, the developer designs the data-access mechanism for his or her planned object-oriented application. *Id*. According to the '502 patent, code for interface object classes—classes that permit access to data in a relational database—is automatically generated. SAPA1119 ¶ 88; *see also* A235 ['502 patent], Figure 1 and 2:28-39. During runtime, *i.e.*, when the software application is executed, objects are instantiated from the classes and reside in memory. *See* SAPA1090 ¶ 26. There is no block of software code that represents an instantiated object. *Id* ¶ 27. Runtime is illustrated in Figure 7, reproduced below.



*FIG. 7*

As the object-oriented application is executing, objects are instantiated from the interface object classes, and interact with both the application and the runtime engine. *See* SAPA1121-22 ¶ 90. Often, during execution, the software application needs to access data residing in a relational database. The instantiated interface objects are responsible for providing the functionality that allows this access. *Id.* Figure 7 shows an instance ("aBusinessObject") of a class ("BPerson") within the application calling specific methods ("getName()" and "Save()") of an interface object ("aDslObject") of a class ("BPerson") at runtime to access data in the relational database. *See id.* ¶¶ 90, 91.

## III.   THE ACCUSED PRODUCTS

DataTern accuses MicroStrategy's Business Intelligence Platform, MicroStrategy 9, MicroStrategy Intelligence Server, and Cloud Personal of infringing the '502 patent. A231 ¶ 12. MicroStrategy's flagship business intelligence software is known as the MicroStrategy Business Intelligence Platform, which runs against data in a variety of locations including data warehouses, operational databases, and enterprise resource planning ("ERP") systems. *See* 1223. The MicroStrategy Business Intelligence Platform offers user-friendly capabilities for data query, reporting, and advanced analytical needs, and distributes to users valuable insight on this data over the web and wireless communications. See *id.*; A1220. MicroStrategy 9 is a recent release of the

14

MicroStrategy Business Intelligence Platform which builds upon MicroStrategy's Business Intelligence architecture and provides performance, accessibility, and scalability enhancements. *Id.* MicroStrategy 9 provides features such as multiple data source support, a web-based interface, dashboards, an enhanced SQL engine, and internationalization support. *Id.* MicroStrategy's products also include the MicroStrategy Intelligence Server which provides analytical processing and job management for all reporting, analysis and monitoring applications. *See* A1224; A1230. Another MicroStrategy product, MicroStrategy Cloud Personal, allows customers to upload data to the MicroStrategy "Cloud" and analyze the data directly from within a browser. A1232. MicroStrategy's customers have all been sued based on their use or incorporation of the MicroStrategy accused products. *See* A1056; *see also* A231 ¶13.

DataTern contends that MicroStrategy's Business Intelligence platform, including the MicroStrategy Intelligence Server, infringes the asserted claims of the '502 patent by providing access to data from a relational database. *See* A1091 [DataTern's Amended Infringement Contentions]. In particular, DataTern alleges that certain applications in a portion of the Business Intelligence platform (called the "Report" layer) "utilize the Intelligence Server in the MicroStrategy Business Intelligence platform to access data from a relational database." A1100 at 10-11. DataTern did not, however, identify in its contentions any aspect of the accused

products that generate software code constituting an interface object class (nor could it have).

## IV.  THE UNDERLYING LITIGATIONS

After DataTern filed its several lawsuits against MicroStrategy and its business partners, the Massachusetts court consolidated the actions into a single case but denied MicroStrategy's motion to stay.  A261.  The Defendants asked DataTern whether it intended to pursue claims against MicroStrategy's business partners "separate and independent of operation of the products with technology from MicroStrategy," but DataTern did not respond.  A1237-38 at 3-4.  In its Scheduling Order, the Massachusetts court ordered DataTern to "indicate to the court whether it intends to pursue claims of infringement against each non-MicroStrategy defendant for alleged infringement independent of each defendant's use of MicroStrategy products (and if so identify which defendants and which products)."  A1209 ¶ 11.  The Massachusetts court also ordered DataTern to serve infringement contentions.  *Id.*  DataTern then revealed that the "focus of this case has been and remains the MicroStrategy technology."  A1056 at 1.  Consequently, the Massachusetts court stayed the cases against MicroStrategy's business partners over DataTern's opposition. A1209 ¶ 16.

DataTern's original and court-ordered supplemental infringement contentions were fatally deficient and did not adequately put MicroStrategy on

notice of DataTern's infringement theories. A1209-10 ¶¶ 17-27; *see also* A294 and A1091. DataTern stated that it would be "glad to supplement after reviewing the source code when it is produced." A1210 ¶ 28. So MicroStrategy made its source code available to DataTern. *Id.* ¶ 29. DataTern, however, never inspected MicroStrategy's source code.

In the meantime, the New York court entered a claim construction order construing certain terms of the '502 patent. A101. The constructions adversely impacted DataTern's infringement case against MicroStrategy. As a result, DataTern moved to stay the Massachusetts case. A1239. In New York, DataTern conceded that it could not prove that Microsoft's and SAP's products infringed under the claim construction order and consented to judgment of noninfringement. A1211 ¶ 38. In Massachusetts also, DataTern admitted noninfringement by MicroStrategy's products under the claim construction order. A1248 [DataTern's Offer of Judgment] ¶ 18. Both MicroStrategy and DataTern separately moved for summary judgment based on DataTern's concession. A73, A1200. In particular, DataTern stipulated that under the New York court's construction of "to create at least one interface object" [the accused MicroStrategy product] "does not infringe the '502 Patent as it does not meet the limitation to create an interface object in that it does not 'generate code for at least one class and instantiate an object from that class' within the meaning of the NY Markman Order." A1252 [Proposed

Judgment] ¶ 1.  The Massachusetts court granted the parties' motions for summary judgment of noninfringement on the stipulated ground and granted summary judgment of noninfringement in favor of each MicroStrategy customer named in the two consolidated court cases.  A1-2.  DataTern now appeals.  A109.

## **Summary of Argument**

The specification and drawings of the '502 patent and the plain language of the claims all confirm that the sole claim term at issue in this appeal—"to create at least one interface object"—necessarily involves generating code for an interface object *class* and instantiating an interface object from that class.  In particular, the '502 patent shows that the process of creating of an interface object is a two-step process—1) "employing" a map to generate code for an interface object class, and 2) instantiating an interface object from the class.  For this reason, this Court should find that the New York court correctly held that using a map to create an interface object necessarily involves generating software code for the creation of a class.  Neither DataTern nor its expert has been able to identify any embodiment in '502 patent that does not involve code generation for an interface object class.  Moreover, DataTern is wrong in arguing for a dictionary definition for the phrase "to create" because it improperly isolates this phrase from the remainder of the claim term at issue and ignores the context of the surrounding claim language.

# Argument

## I.    STANDARD OF REVIEW

This Court reviews a court's claim construction ruling *de novo*. *Cybor Corp. v. Fas Techs.*, 138 F.3d 1448, 1454-56 (Fed. Cir. 1998) (*en banc*).

## II.    CLAIM CONSTRUCTION MUST BE PERFORMED IN THE CONTEXT OF THE ENTIRE PATENT

In claim construction, the patent specification "is always highly relevant to the claim construction analysis. Usually it is dispositive; it is the single best guide to the meaning of a disputed term." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (en banc) (quotation omitted). Further, the plain language of the claim often provides "substantial guidance as to the meaning of particular claim terms." *Id.* at 1314. Specifically, "the context of the surrounding words of the claim [] must be considered in determining the ordinary and customary meaning of those terms." *Id.* at 1314 (quoting *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003)). The claim terms should be read "not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* at 1313. The construction that "most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Id.* at 1316; *see also SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001)

("Claims are not interpreted and construed in a vacuum; they are part of and read in light of the specification.").

DataTern's main argument hinges on a dictionary definition of "to create," namely "to make," and ignores the rest of the claim term at issue.  BB at 9. Dictionary definitions have limitations in their usefulness in a claim-construction analysis.  *See Phillips* at 1321-22.  "Because words often have multiple dictionary definitions, some having no relation to the claimed invention, the intrinsic record must always be consulted to identify which of the different possible dictionary meanings of the claim terms in issue is most consistent with the use of the words by the inventor."  *Texas Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1203 (Fed. Cir. 2002).  "Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim."  *Phillips* at 1316.  This Court should affirm because the New York court's analysis was correct.

### III.    THE PATENT SPECIFICATION CONFIRMS CLAIM 1 REQUIRES GENERATION OF COMPUTER CODE TO CREATE A CLASS

The '502 patent specification confirms what the New York court found: that code generation is required when employing a map "to create at least one interface object."  A116-119.  Particularly, the '502 patent specification shows that in order to create an interface object, computer code is generated to define an interface

object ***class***, and interface objects can be instantiated from that class. SAPA1109-10 [Hosking Decl.] ¶ 68; *see also* A235 ['502 patent], Figure 1 and 2:28-39.

Code generation to define a class is central to the patent's specific, "automated" implementation for programmatically accessing a database through "interface objects." A235 ['502 patent], Abstract; 1:58-59; 2:32-34. The '502 patent specification discloses that in the alleged invention "[a] code generator 18 is employed to examine the relationships that are defined in the map 12 and a model object oriented interface associated with an object oriented software 22 to generate interface objects." *Id.*, 2:32-34. Further, Figure 1 of the patent shows that code generation is required "to create at least one interface object." Namely, Figure 1 (below) depicts an arrow from the map 12 to the code generator 18 and from the code generator 18 to the interface objects 20. The '502 patent discloses no other way to create interface objects.



*FIG. 1*

In fact, DataTern's own technical expert confirmed during his deposition in the New York Action that there is no embodiment in the '502 patent that creates interface objects by any means other than code generation:

21

> Q.  Can you identify any embodiments of the '502 patent claims where it uses anything but the code generator to generate interface objects?

> A.  No.  Sitting here today I am not aware of any embodiments of the '502 that **create** the interface objects via a mechanism other than the code generator.[2]

SAPA1352 [Gupta Dep. Tr.] at 199:15-21 (emphasis added).

DataTern's attempt to argue "Figure 1 shows alternative means for creating interface objects" is easily dismantled. BB at 16.  DataTern contends that "interface objects" can be created without code generation because Figure 1 shows "one arrow leading from the map 12 to the runtime engine 24 and another arrow leading from the runtime engine 24 to the interface objects 20." BB at 17.  But the specification makes clear that this interaction between the map, interface objects, and runtime engine is a runtime operation that only occurs after the interface objects have been instantiated: "A code generator 18 is employed … to generate interface objects 20.  The interface objects 20 are employed by the object oriented software application 22 to access the relational database 16 via a runtime engine 24, which also uses the map 12 to drive its processing."  A235, 2:31-39.  In this runtime operation, the runtime engine does not use the map to create interface

---

[2] DataTern contends that its expert did not concede that code generation is required for the creation of interface objects, allegedly because he was asked about "generating" and not about "creating" interface objects. BB at n.4.  The transcript, however, plainly belies this argument.  Dr. Gupta used the word "create" in his response to concede that he is, in fact, not aware of any embodiments in the '502 patent that "**create** the interface objects" other than through code generation. SAPA1352 at 199:15-21 (emphasis added).

objects, but uses the map only to "drive its processing," after the code generator generates classes for the interface objects. *Id.*

The specification later reiterates this operation, stating that during runtime a runtime engine library loads information from the map and makes it available to ***existing*** interface objects—it does not use the map to create interface objects. *Id.*, 5:67–6:7. DataTern does not cite any portion of the specification to support its interpretation of Figure 1.

DataTern next points to Figure 7 to support its argument that creating an interface object does not require code generation. BB at 34. DataTern alleges that Figure 7 illustrates a business object creating a Dsl object (labeled aDslObject), and that the related description does not indicate that any code is generated for a class to bring the Dsl object into existence. *Id.* (quoting '502 patent, A235, at 6:31-32.) To the contrary, Figure 7 and the related disclosure are entirely consistent with the New York court's construction, which requires code generation to create a class.

DataTern's reliance on Figure 7 is another example of its improper focus on the word "create" in total isolation, absent the relevant context. The word "create" in used in the context of Figure 7 to describe only the process of ***instantiation*** of the aDslobject object from a class—an altogether different context from that in which "create" is used in the claim. The claim requires "employing the map" to

"create the at least one interface object."  As stated previously (*see* Section II), the map is used at design-time to generate code for the interface object classes, and then at runtime, interface objects are instantiated from the generated interface object classes.  Figure 7 illustrates only the latter half of this process, i.e., runtime operation.  A235 ['502 patent], at 2:23-24. ("Fig. 7 is a sequence diagram that illustrates operation of the runtime engine").

Moreover, during runtime, a business object instantiates an object of the DPerson class, named aDslObject.  *Id.*, Figure 5; 6:32-35.  In describing Figure 7, DataTern leaves out the sentence following that cited in DataTern's brief, which identifies the DPerson class as "the ***generated*** COM implementation ***class.***"  *Id.*, 6:36 (emphasis added.)  Previously the specification refers to DPerson as one of the "generated DLLs 56." *Id.*, 5:62-67.  And Figure 5 similarly depicts the DPerson class as part of a "Generated DLL."  Thus, Figure 7 only further confirms the New York court's construction—aDslObject was created by generating code for a class (DPerson) and instantiating an object from that class (aDslObject).  DataTern cannot identify any "interface objects" described in the specification where the code for the class defining that object was not generated.

## IV.    THE SURROUNDING CLAIM LANGUAGE CONFIRMS CLAIM 1 REQUIRES CODE GENERATION FOR A CLASS

The New York court appropriately construed the entire disputed phrase "to create at least one interface object" in the context of the remainder of the claim. *See Hockerson-Halberstadt, Inc. v. Converse Inc.*, 183 F.3d 1369, 1374 (Fed. Cir. 1999) ("Proper claim construction, however, demands interpretation of the entire claim in context, not a single element in isolation.").

DataTern, however, prunes the claim term at issue by arguing the meaning of the term "create," as opposed to the larger claim term, and ignores the surrounding claim language that provides additional context—"employing the map to create at least one interface object."    BB at 20.    As a threshold matter, DataTern's proposed interpretation of the isolated term "to create"—namely "to make"—does little to resolve the parties' dispute over proper claim scope, which is the purpose claim construction.    *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.,* 521 F.3d 1351, 1360 (Fed. Cir. 2008) ("When the parties raise an actual dispute regarding the proper scope of these claims, the court, not the jury, must resolve that dispute.")

Moreover, DataTern contends the limitation "to create at least one interface object" cannot require code generation because the term "create" appears in other claim limitations and places in the specification where code generation is not required.    BB at 18, 25-28.    In this instance, however, it is imperative that "create"

25

be considered within the context of the entire phrase selected for construction, not extracted from the rest of the disputed limitation. *See IGT v. Bally Gaming Intern., Inc.*, 659 F.3d 1109, 1117 (Fed. Cir. 2011) ("We caution that claim language must be construed in the context of the claim in which it appears. Extracting a single word from a claim divorced from the surrounding limitations can lead construction astray."). The term "create" is given meaning by the remainder of the disputed phrase, which tells us what is being created—an "interface object." It should be expected, therefore, that "create" takes on a meaning within the larger phrase "to create an interface object" different from what it might mean in, for example, Claim 41's phrase "creating schema in the database." By analogy, creating bread requires baking whereas creating ice requires freezing. DataTern is likewise wrong that the New York court's construction could be applied to "creating" in claim 39. BB at 18, and 27-28. There too, the word "creating" takes on a different meaning within the larger phrase "creating an object model." Thus, DataTern errs in considering only a portion of the disputed limitation. The New York court properly considered (and construed) the entire phrase.

DataTern not only isolates "create" from the remainder of the construed phrase, DataTern's position overlooks the additional requirement of claim 1 that an interface object is created by "employing a map." The '502 patent specification

makes clear that *employing a map* to create an interface object *requires code generation.*    (2:31-34) ("[a] code generator 18 is employed to examine the relationships that are defined in the map 12 . . . to generate interface objects 20"). DataTern still maintains that interface objects could be created from an existing class, *i.e.*, without code generation.  BB at 32.  Yet, DataTern is unable to support this interpretation with intrinsic evidence.  As stated previously, the '502 patent specification teaches that the creation and use of "interface objects" is a two-phase process.  *See* SAPA1109-10 ¶ 68.  During design-time, code for the interface object classes defining the interface objects is automatically generated by *employing the map* between the object model and the relational database schema. *See* SAPA1109-10 ¶ 68; SAPA1119 ¶ 85; A235 ['502 patent], Figure 1 and 2:28-39.  During runtime, as the generated code is being executed, interface objects are instantiated from the interface object classes and are used in conjunction with a "runtime engine" to access data in the relational database.  *See* SAPA1109-10 ¶68. The use of pre-existing classes at design-time would stretch the bounds of the patent to cover techniques repeatedly criticized by the patentee and DataTern as inefficient, outdated, and not part of the "vision" of the alleged invention.  *See* SAPA5328 [Sept. 1997 Provisional].  For example, such an interpretation would cover prior-art hand-coding of generic, pre-existing classes.    SAPA4437

[9/14/1998 Ontos Press Release] (touting the advantages of the embodying software's "automatic" code generation over "traditional hand coding").

DataTern apparently also contends that interface objects could be created *during runtime* from an existing class, *i.e.*, without code generation.  BB at 32.  But this view contradicts the specification and again ignores the claim requirement that interface objects are created by "employing the map."   The patent specification states that during runtime, the runtime engine merely loads a representation of the map and ***makes it available to existing, instantiated interface objects***, not that a map is employed to create any interface objects.  A235 ['502 patent], 6:2–7.

To further support its position, DataTern, in its opening brief in the SAP Appeal, cites to "example" preexisting classes in the '502 patent referenced by its expert, Dr. Gupta—OObject and OOBase classes.  SAPBB at 41.  This argument too must fail because it runs counter to the intrinsic record.  The '502 patent specification makes clear that OOBase is a "base ***abstract*** class," which is by definition unable to instantiate objects and therefore cannot be a pre-existing class from which interface objects are instantiated.  *Id.*, 6:9-11.  Moreover, the OObject and OOBase classes are runtime engine classes, not interface object classes. *See, e.g.*, *Id.*, 6:8-11 (referring to OObject as a "runtime engine" "class"); Fig.5 (showing OObject as part of "Core Runtime Services").  Claim 22 of the '502 patent establishes that a runtime engine class is different from an interface object

class by drawing a clear distinction between the two. *See id.*, Patent Reexamination Cert. 1:25-27; 6:26-30; A1122-24 [Hosking Decl.] ¶ 91-1. DataTern therefore cannot identify a pre-existing class from which interface objects are instantiated because one does not exist. At best, DataTern can only follows its expert's lead and discuss pre-existing classes that merely are "part of" the creation of an interface object but that are not themselves interface object classes. *See* SAPBB at 39. For the foregoing reasons, in light of the specification's teachings, any construction of "creating at least one interface object" that does not require code generation would be inconsistent with the requirement of claim 1 that interface objects are created by "employing a map."

## V.    CLAIM 10 CONFIRMS THAT CLAIM 1 REQUIRES CODE GENERATION

Claim 1, a method claim, recites the step of employing a map "<u>to create at least one interface object</u>." A235 ['502 patent], 7:59-63. Claim 10, on the other hand, is an apparatus claim that recites, in relevant part, "a code generator" that employs a map "<u>to create at least one interface object</u>." *Id.*, 8:32-35. Claim 10's language is thus informative regarding how interface objects are in fact created— through "a code generator." As an apparatus claim, claim 10 must specify the active component that creates the interface object. That apparatus claim 10 recites a "code generator" that implements the "creation" step sheds light on how the interface objects recited in method claim 1 are "created," namely through code

generation.  *Id.*  Thus, the plain language of claim 10 confirms the New York court's construction.

DataTern cites the same claim 10 language discussed above, but instead attempts to invoke the doctrine of claim differentiation to support its position.  BB at 28-29.  DataTern specifically argues that claim differentiation requires that claim 10's "code generator" limitation should not be imported into claim 1.  *Id.* Claim differentiation, however, applies only where a proposed claim construction would render claims identical.  *See Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 806 (Fed. Cir. 2007); *See also Sinorgchem Co. v. ITC*, 511 F.3d 1132, 1140 (Fed. Cir. 2007).  DataTern's argument effectively contends that the New York court's claims construction results in claims 1 and 10 having identical scope.  Not so.  As noted above, claim 10 is an apparatus claim ("computer program fixed on a computer-readable medium") that recites components, while claim 1 is a method claim that covers a series of steps.  A235 ['502 patent], claims 1 and 10. Moreover, the patentee adopted the common patent drafting approach of reciting dependent "method" claims 2-9 (dependent on claim 1) and dependent apparatus claims 11-18 (dependent on claim 10) in an effort to separate out the apparatus and method analogs of similar subject matter.  *See id.*, claims.  The patentee's express intentions were thus to have two separate sets of claims covering different statutory classes.  The New York court's construction preserves and respects the patentee's

30

intentions.  Also, as the New York court pointed out, there are other significant differences between claims 1 and 10.  See A118-19 [Markman Opinion and Order in Microsoft v. DataTern and SAP v. DataTern] ("there are other language differences between Claims 1 and 10 that further differentiate them").  For example, claim 10 does not have a limitation analogous to claim 1's step of "selecting an object model."  A235 ['502 patent], claim 10.  Also, claim 10 recites a "mapping routine" that is not recited in claim 1.  *Id.*

Moreover, that the two claims at issue are independent claims, not one claim that is dependent upon another, further belies the application of the claim differentiation doctrine.  *See Hormone Research Found., Inc. v. Genentech, Inc.*, 904 F.2d 1558, 1567 (Fed. Cir. 1990) ("It is not unusual that separate claims may define the invention using different terminology, especially where … independent claims are involved").  In other words, in this instance no dependent claim is in danger of being rendered superfluous through construction of the independent claim on which it depends.  DataTern's citation to *Hologic* is also inapposite.  In *Hologic*, the two independent claims at issue were co-extensive, *i.e.*, both were apparatus claims, and the proposed construction sought to add physical expressly features recited in one apparatus claim to another apparatus claim where those features were absent.  *Hologic* at 1336.  Here, DataTern's arguments relate to two independent claims clearly directed at different statutory subject matters, and

where one includes a limitation missing entirely from the other.  Further, unlike *Hologic*, the New York court's construction does not add limitations to any claim but merely seeks to provide guidance to the jury regarding limitations expressly present in the claim itself.

Finally, even if the doctrine of claim differentiation is found to apply here, it cannot be used to enlarge the scope of the claims beyond the disclosure in the specification.  *Kraft Foods, Inc. v. Int'l Trading Co.*, 203 F.3d 1362, 1368 (Fed. Cir. 2000) (rejecting claim differentiation argument in light of specification and prosecution history and noting that "claim differentiation can not broaden claims beyond their correct scope," quoting *Multiform Desiccants Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1480 (Fed. Cir. 1998)).  As stated previously (*see* Section III), the '502 patent does not disclose any embodiment for creating interface objects other than through the generation of code for a class.  Accordingly, in light of the specification's teachings, any construction of "creating at least one interface object" that does not require code generation for a class would result in impermissible broadening of the scope of claim 1.

## VI.  DATATERN CANNOT SHOW INFRINGEMENT UNDER THE NEW YORK COURT'S CLAIM CONSTRUCTION

As noted above, DataTern conceded that it could not prove infringement under the New York Court Construction of the term "to create at least one interface object."  The record shows it had no choice but to concede:  In its infringement

32

contentions, DataTern identified MicroStrategy's Intelligence Server and Metadata Repository as the "runtime engine" and "map" respectively of claim 1. *See* A1091 [DataTern's Amended Infringement Contentions]. DataTern thus asserted that MicroStrategy's products "create at least one interface object" because when an object oriented application requires access to data from a relational database, "the MicroStrategy Intelligence Server component of the MicroStrategy Business Intelligence platform instantiates an interface object employing the persisted metadata repository." A1097. In other words, DataTern contended that MicroStrategy's products "create . . . an interface object" when the accused products instantiate a software object from an existing software class. DataTern did not (and indeed could not) allege that MicroStrategy's products generate software code constituting the required interface object "class" under the court's claim construction, which is then, in turn, able to instantiate the alleged interface objects. DataTern did not (and could not) adduce any evidence to support this theory, or specifically identify which alleged instantiated object within MicroStrategy's software products constitutes the alleged "interface object" under the court's claim construction. The record is clear that nothing in the accused products generated software code constituting the required interface object class, and thus the Massachusetts court properly granted summary judgment of noninfringement based on DataTern's concession.

## Conclusion

For the foregoing reasons, the Massachusetts court's judgment should be affirmed.

Respectfully submitted,

By: */s/ Adam J. Kessel*
Adam J. Kessel
kessel@fr.com
Gregory A. Madera
madera@fr.com
Sivananda K. Reddy
reddy@fr.com
FISH & RICHARDSON P.C.
ONE Marina Park Drive
Boston, MA 02210
Phone: 617-542-5070

Benjamin K. Thompson
bthompson@fr.com
FISH & RICHARDSON P.C.
1180 Peachtree Street 21st Fl.
Atlanta, FA 20209
Phone: 404-724-2844
*Attorneys for MicroStrategy Inc.*

By: */s/ Stephen R. Buckingham*          By: */s/Matthew E. Leno*
Stephen R. Buckingham                    Matthew E. Leno
sbuckingham@lowenstein.com               Mleno@mwe.com
Lowenstien Sandler LLP                   McDermott Will & Emery LLP
65 Livingston Ave.                       28 State Street
Roseland, NJ 07068                       Boston, MA 02109
Phone: 973-597-2326                      Phone: 617-535-4000
*Attorney for Epicor Software Corporation*   *Attorney for Premier, Inc.*

34

By: /s/ Richard G. Frenkel
Richard G. Frenkel
Rick.Frenkel@lw.com
Melissa A. Kopacz
Melissa.Kopacz@lw.com
Latham & Watkins LLP
140 Scott Dr.
Menlo Park, CA 94025
Phone: 650-328-4600
Attorneys for Blazent, Inc.

By: /s/J. David Hadden
J. David Hadden
dhadden@fenwick.com
Darren E. Donnelly
ddonnelly@fenwick.com
Ryan Tyz
rtyz@fenwick.com
Phillip J. Haack
Phaack@fenwick.com
Fenwick & West LLP
801 California Street
Mountain View, CA 94041
Phone: 650-988-8500
Attorneys for Informatica Corporation

By: /s/ Craig R. Smith
Craig R. Smith
Csmith@LALAW.com
Lando & Anastasi LLP
One Main Street
Cambridge, MA 02142
Phone: 617-395-7000
Attorney for Teradata Corporation

By: /s/ Dominic Massa
Dominic Massa
Dominic.Massa@wilmerhale.com
Wilmer Cutler Pickering Hale & Dorr
60 State Street
Boston, MA 02109
Phone: 617-526-6386
Attorney for Airlines Reporting
Corporation

By: /s/ Michael C. McCarthy
Michael C. McCarthy
Mike.McCarthy@maslon.com
Keiko L. Sugisaka
Keiki.Sugisaka@maslon.com
Maslon Edelman Borman
& Brand, LLP
3300 Wells Fargo Center
90 South Seventh St.
Minneapolis, MN 55402
Phone: 612-672-8200
Attorneys for Lancet Software
Development, Inc.

By: /s/ Brian P. Voke
Brian P. Voke
bvoke@campbell-trial-lawyers.com
Campbell Campbell Edwards
& Conroy
One Constitution Center, 3rd  Fl
Boston, MA 02129
Phone: 617-241-3000
Attorney for Carl Warren & Co., Inc.

## <u>CERTIFICATE OF SERVICE</u>

I certify that on July 25, 2013, a true and correct copy of the foregoing **JOINT BRIEF FOR CERTAIN DEFENDANT-APPELLEES** was electronically filed with the Clerk of this Court using the CM/ECF System, and a copy was also sent electronically via the court's CM/ECF system to the following counsel registered as CM/ECF users:

Stephen R. Buckingham
Lowenstien Sandler LLP
65 Livingston Ave.
Roseland, NJ 07068
sbuckingham@lowenstein.com
*Attorney for Epicor Software Corporation*

Matthew E. Leno
McDermott Will & Emery LLP
28 State Street
Boston, MA 02109
Mleno@mwe.com
*Attorney for Premier, Inc.*

Richard G. Frenkel
Melissa A. Kopacz
Latham & Watkins LLP
140 Scott Dr.
Menlo Park, CA 94025
rick.frenkel@lw.com
melissa.kopacz@lw.com
*Attorneys for Blazent, Inc.*

Dominic Massa
Wilmer Cutler Pickering Hale & Dor
60 State Street
Boston, MA 02109
Dominic.Massa@wilmerhale.com
*Attorney for Airlines Reporting Corporation*

J. David Hadden
Darren E. Donnelly
Ryan Tyz
Phillip J. Haack
Fenwick & West LLP
801 California Street
Mountain View, CA 94041
dhadden@fenwick.com
ddonnelly@fenwick.com
rtyz@fenwick.com
Phaack@fenwick.com
*Attorneys for Informatica Corporation*

Michael C. McCarthy
Keiko L. Sugisaka
Maslon Edelman Borman
& Brand, LLP
3300 Wells Fargo Center
90 South Seventh St.
Minneapolis, MN 55402
Mike.McCarthy@maslon.com
Keiki.Sugisaka@maslon.com
*Attorneys for Lancet Software Development, Inc.*

Craig R. Smith
Lando & Anastasi LLP
One Main Street
Cambridge, MA 02142
Csmith@LALAW.com
*Attorney for Teradata Corporation*

Brian P. Voke
Campbell Campbell Edwards
& Conroy
One Constitution Center, 3rd Fl
Boston, MA 02129
bvoke@campbell-trial-lawyers.com
*Attorney for Carl Warren & Co., Inc.*

Erik Paul Belt
David J. Kelly
McCarter & English, LLP
265 Franklin Street
Boston, Massachusetts 02110
ebelt@mccarter.com
dkelly@mccarter.com
*Attorneys for DataTern, Inc.*

A paper copy will also be sent via U.S. Mail to the below counsel:

Steven M. Coyle
Cantor Colburn LLP
55 Griffin Road South
Bloomfield, CT 06002
scoyle@cantorcolburn.com
*Attorney for Magic Software
Entertainment, Inc.*

Paper copies will also be mailed to the above counsel at the time paper copies are

sent to the Court.

Upon acceptance by the Court of the e-filed document, six paper copies will

be filed with the Court, via Federal Express, within the time provided in the

Court's rules.

By: */s/ Adam J. Kessel*
Adam J. Kessel
*Attorney for Defendant-Appellee
MicroStrategy Inc.*

37

# **CERTIFICATE OF COMPLIANCE**

This **JOINT BRIEF FOR CERTAIN DEFENDANT-APPELLEES** is submitted in accordance with the type-volume limitation of Rule 32(a)(7)(B)(i) of the Federal Rules of Appellate Procedure.  The Brief contains <u>6,843</u> words, as determined by Microsoft Word.

Dated:  July 25, 2013        By: <u>*/s/ Adam J. Kessel*</u>

                                       Adam J. Kessel
                                       *Attorney for Defendant-Appellee*
                                       *MicroStrategy Inc.*